We will hear from the appellant, who is the defendant, right? That's correct. Good afternoon, Your Honor. I'm Martin H. Kingbound, and I represent the appellant. This is a tax case, and the appellant and defendant in the criminal case was convicted on all the counts, 5 counts of structuring, 4 counts of tax evasion, and 4 counts of filing false tax returns. The trial is fundamentally and constitutionally unfair, and here are the reasons why. First of all, the defendant attempted to put into the record a payment of some $459,000 that paid all the tax. The district court excluded that evidence. Under Cheek, the defendant had the right to have the jury consider that evidence, because this is a specific intent case, to show a good faith. When was that payment made, though? The payment was made approximately a month and a half before the trial. It still is evidence for the jury. Does that mean it was after the indictment? After the information? Yes, Your Honor. Or the information? If you look at the facts of the Cheek case, an early 1990 case in the United States Supreme Court, they took this outrageous case of an American Airlines pilot saying in the 1990s that wages from American Airlines is not taxable. And the Supreme Court stated in reverse of conviction that the jury had the right to consider whether or not the defendant, in that case Cheek, had a specific good faith intention to straighten out his tax affairs. And in this case, it was for the jury to decide what that meant. Wait a minute. Wait a minute. A good faith intent to straighten it out? You mean after he was indicted? I don't remember that from Cheek. The jury still had a good faith. He had a specific, subjective good faith which could be put before the jury. You know, you could argue the other way. You could say, oh, well, that's a confession. But still it's a jury question and it shouldn't be excluded. No, but what I'm getting at is Cheek didn't involve an issue of timing, did it, like this case does? I don't know. I don't recall, Your Honor. I just recall. Oh, that's a crucial distinction. If you don't recall, then, you know, pass on to something else. But it would be a jury question as to the timing as to whether it was in good faith. By the way, Your Honor, I'd like to reserve three minutes for rebuttal. Keep track of the timer there. Okay. That was excluded. So on that ground alone, you can have reversal. On the other hand, the district court allowed into evidence records that were purportedly business records that a special agent had gotten on the stand and said, I got these records from another special agent who claimed to have gotten them from the owner and they claimed that they were business records. So right now you have the exclusion of the tax payment evidence and inclusion of about voluminous records that amounted to about 65, 66 percent of the case of the government. And the theory was that either it was a business record, but there was no one around to make nexus of the defendant. There was no knowledgeable person who could testify that at or when all these entries were made. There was nobody who could say for certain that the defendant had that as an admission. So it wasn't an 801 D2 admission. Those records pertain to all of the counts or just some of the counts? Those records pertain to all the tax counts. To all the tax counts. Is that right? Correct. All right. Because the government's argument here was that the substantial income was omitted that we received. Do I understand we're talking about invoices and checks? Are these the records you're referring to? That's correct, Your Honor. Let me tell you how I analyze it and you tell me where I've missed the boat. Okay. The checks are commercial papers. They are self-authenticating and don't need anybody to come in and testify to what they are. They are admissible under Rule 901 without any kind of shepherding witness. They're self-authenticating. The invoices look to me as though, at least the government says in its brief, that the invoices were identical to other invoices that were received into evidence, that they were corroborated by different colored carbon copies of the same invoices, and that the numbers were in sequence with other invoices that were there, and so there was circumstantial evidence that these things were authentic. I didn't see any answer in your reply brief to those contentions. First of all, there is a business records which include checks and the other invoices are not self-authentic. No, business records are an exception to the hearsay rule. I'm not talking about whether they're hearsay or not hearsay. I'm talking about whether they are authentic. And they are self-authenticating under Rule 901. The records themselves are not. What you're talking about are checks from the Exhibits 14 and 38, which were from vendors allegedly in payment for goods or products or whatever, and the district court looked at it because it said the endorsement on the back of the checks represented an admission, but there is no evidence, like in the usual case, you're going to connect it up. There's no evidence that the defendant put the endorsement on there. There's no evidence that the defendant created those invoices, unlike the Gill and Moran. But right there you're talking about, you know, are they authentic or not? Authentication, and to children's point is, under the evidence code, a negotiable instrument, a check is a self-authenticating document. You don't need to have someone come in and say, yes, that's a check, that's the amount, that's an endorsement. It wasn't the defendant's check. It was the vendor's check. It's anybody's check. Any check is self-authenticating. This check or these checks were not in the record. Well, you tell me why these checks don't come under the self-authentication rule. Because they were checks that they would come under if the defendant's endorsement, if that was the endorsement. Are you talking about the district court, sir? I'm talking about what the rules of evidence say. Well, any of these checks were they found to be in the bank records of the defendant, and if they were, let's assume for the moment they're authentic. What does that prove? Does it prove it was taxable income? Is it a tax case? They might be in the record, but there was no one to say whether it was. It's relevance, not its authenticity. My argument is both, because there's no indication that it was issued properly. Besides, the government had in the case, right before the special agent testified, the long-standing accountant, and that long-standing accountant on the Mike Cross examination said that he prepared accounting records by looking at invoices and checks. Now, why didn't they put the questions to this long-standing accounting? Is it true that there were other identical invoices that were received into evidence properly? There were similar invoices. What about colored carbon copies? Is it true that there were different colored carbon copies of the same invoices also in evidence? There were carbon copies in evidence of invoices. Whether they were of these invoices, I'm not sure, but let's... How about, is it true that the invoices were in the same sequence, numerical sequence with other invoices that were in Sima's invoice book? Could be that they were, but the point is, anyone could put together, in this day and age, invoices and put numbers on them. True, that goes to the rate of security. That goes to whether or not, after all, if you're looking for a business records exception, which is an exception to the hearsay rule, now you're looking for another exception to say we don't need a custodian of the records, we don't need anybody proper to identify, like the rest of the case, where other vendors had individuals on the stand who identified the checks, identified the invoices, and said what they were for. In fact, there was one instance where one vendor said that there was a deduction or credit or an offset for payment the other way. I mean, how do you know that these checks represent taxable income? How do you know that these invoices are authentic, that they really represented goods and products? And why didn't the government ask the question of the longstanding accountant? Look, you look at invoices and checks. Here's Exhibit 14, here's Exhibit 38, here's Exhibit 39. Can you identify these? Can you then tell us what they were for? No, you don't have any of that. Why not? I mean, there's an inference, a negative one, that's drawn when somebody has control of a witness, doesn't put them on. There's also a negative inference where you put a witness on and don't ask them the relevant questions. That would have been real easy because that accountant was on there for a long time, and he said he was a longstanding accountant. So you have eight seconds left. You have five seconds left. If you quit now, I'll give you a minute for rebuttal. You only got a second left. OK. You want to quit now? I'll give you one minute for rebuttal. Yes. All right. Good afternoon, Your Honors. My name is Tom Moore. I'm with the U.S. Attorney's Office in San Francisco, California. The court properly excluded the late payment of $459,000. The information in this case was entered on September 2001. The payment of $459,000 was made approximately one month before the trial in July of 2002. The court properly excluded because it had limited probative value, if any at all. It had to show the intent at the time the returns were filed, and this is for determination whether an evasion occurred at the time the returns were filed and not five, six, four years later, just before the eve of trial. It would have prejudiced the government to have had these returns come in because the jury probably would have been confused. As to one of the elements, you must show that there's a tax deficiency. If somebody had paid the taxes one month before trial, it would have confused the jury as to that particular element. As to the government's Exhibits 13 and 48, the government's excerpts of record show that the checks and the invoices were corroborated by other evidence that was seized and admitted. It was seized and presented to the search warrant and was admitted by the court through IRS agents Pam Wu and Ann Luna. I accept that the checks are probably self-authenticating. You would agree that the invoices are not? Your Honor, I think the checks are. I said the checks are self-authenticating. The checks are self-authenticating. Would you agree with me that the invoices by themselves are not self-authenticating? The invoices by themselves are self-authenticating. What rule? It's 9029, Your Honor, as a trade insignia. On the invoices, if you look at the invoices, like government's excerpt of record 168 at the top, it has CINMA Imports Company. And this is, as you can see, there's a base number 14 at the bottom of it. It's 168, Your Honor. 902 what? Are you dependent? 902-9. It's the self-authenticating of trade insignia. And it shows at the top CINMA Imports Company. My 9 doesn't include trade insignia. Where is that? My 9 is commercial paper. Commercial? It must be 7 then, Your Honor. I apologize. 7? All right. Well, all that means is what? It would be self-authenticating. But in this case, the. No, wait a minute. It means inscription is self-authenticating. It doesn't mean the entire document is. OK. OK. If that's the case. 9 says, for instance, right, commercial paper. 9 says, you know, that the entire document is self-authenticating. 7 doesn't say that, does it? You know, it just shows the origin or control of it. And this is the United States put this in. It shows control that CINMA was sending a bill to Wu Li. It says that it's. I understand the relevance of it, but I understand the relevance. I understand the relevance argument. What I don't understand is necessarily the source of the authenticity requirement. I mean, I just don't see that the document is self-authenticating. It's not a commercial paper. And I don't think the insignia exception or the rule applies. Now, there may be another reason it was admissible. I'm just that's where I'm leading it. The United States agrees with the court. The underlying district court judge under 104, she found there was indicia reliability. And that reliability, if you look at record 168 and you compare that. Reliability, are you using that same as meaning authenticity? It shows the authenticity. The stamp on that particular document shows it's an authentic record of CINMA. And this record was in the possession of Wu Li, which gave it to the IRS. And this record was further corroborated at the search warrant and the other exhibit that came in. How do we know that Wu Li gave it to the IRS? Kevin Karamucci, the IRS agent, testified that he received those from another revenue, a special agent, Charlie Bush, who was working on the case. Isn't that hearsay? It is hearsay, but it's also a chain of custody of the records, Your Honor. It shows that Mr. Wu Li gave them to Mr. Bush. Mr. Bush gave them to Mr. Karamucci, who testified in court. Is there a chain of custody exception to the hearsay rule? No, Your Honor. Not that I'm aware of. If the, in fact, if the invoices were not admissible or tell me why you think if there was an error in admitting the invoices, was the error harmless? It would be harmless, because in this case it's admitted that there's an additional 35% of the taxes that were not reported and that were, in fact, evaded. There were five other witnesses, five other business owners, who did business with Sinmah, who conducted business, and their business receipts were not reported on the returns. And so we have five other business people whose funds were not reported on the returns. Well, is that on the same counts as the counts that these exhibits go to, 14 and I guess 38, no? Yes, the counts overlap all four years that were at issue in this. And the exhibits in this, Government's Exhibit 175 corroborates with Government's Exhibit 165. 165, if you'll notice, is Exhibit 14. Those are the ones that we got from Wu Lee. And Exhibit 175 is the exact check which was deposited into the Bank of Canton by Sinmah. They had a bank officer from the Bank of Canton testify, these are our bank records, here it is, here's a copy of the very same check that we also got from Wu Lee. And included in there were the receipts. And the receipts that we got, some of them overlapped exactly with the receipts that we got at the search warrant. We found the underlying books with the pink and the yellow carbon copies were there, and that's where we found those. And so they were corroborated by the records that were seized at the search warrant and also corroborated by the records obtained from Wu Lee. Were they identical documents or just similar documents? Your Honor, they were identical. And was it a carbon copy of the same document or is it a carbon copy indicating a similar document? They were in triplicate, one, two, three. Did the pink and yellow actually come into evidence? Pardon? Did the pink and the yellow actually come into evidence? They came into evidence and those are in the excerpts of record. They came in in the form of Exhibit 26 and the checks came in the form of Exhibit 50. Also with Exhibit 38, they also came in through the receipt books that were admitted to the special agents who conducted the search warrants. Any other questions? I do have one other issue that I'd like you to address, which is on the variance issue. I mean, it seems, I gather your position is that the knowingly element wasn't necessary. However, it seems to me it does alter the indictment significantly because it could alter the way that a defendant would prepare a trial and therefore affect the notice. How do you respond to that? The INC's contendence is surplus in this case because they would have to prepare for the case in all events. In fact, one special agent testified, Ann Luna testified, it's in the record, that Mr. Pang told her when they were doing the interview, he said, I structured these transactions at the Bank of Canton's request because they said, please keep your deposits less than $10,000 because if they're more, we have to fill out this paperwork and send it to the IRS. And they also, the customer said, keep the deposits of cash less than $1,000 so that they won't be interviewed by an IRS investigation. So it's surplus in that respect because it goes to a particular fact item and it narrowed the factors that the government had to prove. It didn't broaden it. The defendant knew, he specified the very cash payment occurred like a $38,000 payment was broken into three different deposits of less than $9,000. They were specified as to the amount paid and the three different deposits were specified in the exact timeframe over a period of time. So there's no surprise as to what they had to defend against. Except for perhaps the element of whether it was knowingly or not. In this case, I think there may be a fair argument that they were on notice. In other cases, I'm not sure that I could consider this to be narrowing necessarily of the government's argument. In other words, it reduced what you had to prove, but then that also reduced the defenses that the defendant had. That's correct. And in another case, and I'm not sure if it's this one or not, a defendant could have been preparing, put all his eggs in one basket, and then say, well, we aren't going to, we're varying our, we've changed what we're charging. Might have a fair argument that that's improper. They would have a fair argument. However, there's a case law where you have a competent counsel attorney who knows what's going on. They are charged with knowledge of the elements of the crime. In this case, there were three elements. They were clearly charged. The United States, the addition of knowingly was an incorrect addition of another element and or an element in the nature of a fact. Also, elements are often basically facts that we have to prove. We did not have to prove knowingly. We only had to prove the three elements that were charged. The jury only looked at the three elements that were charged. They didn't address, didn't have to address that issue. It was never brought up in opening. Well, it was brought up in opening, but it wasn't brought up in closing. Mr. Moore, your time's up. I'm going to ask you one more question. Are you still including knowingly in your tax indictments? No, sir. Your Honor, harmless error is not the principle here because over 65% of the case was represented by Exhibits 14 and 38. As to the knowingly aspect, that was a substantive item that was left over from last time. And Congress had changed the law. The government had 10 months to amend the information. They did not do that. When you take that ruling to the jury at the end of the trial, together with the Rule 104 ruling where the judge said there's other evidence to support the defendant, and I'm going to let this evidence in, but it's for you, the jury, to decide. What other evidence? There was no connecting evidence. Sinma is not one person. There's more than one person. Who prepared these invoices? Who put the endorsement? And then when you take that together with the grand jury abuse where there's a bright line. In Donaldson, they say when you refer a matter for criminal prosecution, you can't go back there as the Internal Revenue Service and start doing an administrative investigation again. And what happened was when you add it all up, you have a totally unfair trial of all the parts, going from the tax payment excluded, all these other records included. And who knows what the chain of custody was because the two other agents didn't testify. There were no exemplars. There were no identification here. There was only the government's hype, the government's argument that puts it together as a Band-Aid. So I say to you, if you look at the record, look at the briefs, you'll see that each of the elements requires reversal. Putting it together, you have a totally unfair trial. Thank you. All right. Thank you, Mr. Chamberlain. Thank you, Mr. Moore. This case is submitted for decision. The panel now will stand and adjourn.
judges: Tashima, Thomas, Silverman